IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 19, 2015

## JAMAR SILER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 99943     Mary Beth Leibowitz, Judge**

_____

**No. E2014-01433-CCA-R3-PC - Filed June 30, 2015**

_____

The Petitioner, Jamar Siler, appeals the Knox County Criminal Court's denial of his petition for post-conviction relief from his conviction for second degree murder, for which he is serving a thirty-year sentence. He contends that his guilty plea was not knowing and voluntary because it was induced by the ineffective assistance of his counsel in the conviction proceedings. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Jamar Siler.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Petitioner's conviction offense relates to the death of Ryan McDonald, whom the

Petitioner shot in the cafeteria of Central High School. The Petitioner was fifteen years old

at the time of the offense, and his case was transferred from juvenile to criminal court.

Although he was charged with first degree murder, he pleaded guilty to second degree

murder with an agreed-upon thirty-year, Range II sentence to be served at 100%. He was eighteen years old when he entered the guilty plea.

At the guilty plea hearing, the trial court advised the Petitioner of his rights, and he indicated that he understood them. The Petitioner agreed he was entering into the plea agreement knowingly and of his own free will. He denied that anyone had forced or coerced him into accepting the offer. He said he was satisfied with defense counsel's efforts on his behalf. The court found that the plea was offered freely, voluntarily, and knowingly.

As part of the recitation of the facts at the guilty plea hearing, the State noted the following:

> If we went to trial as expected, . . . [defense counsel] would attempt to develop proof from expert witnesses that he has secured that [the Petitioner] has fetal alcohol syndrome. That he has a borderline intellectual capacity. And I believe that the proof would be unrebutted on that issue by the State.

At the post-conviction hearing, the proof centered on whether defense counsel provided ineffective assistance in his preparation for the trial and specifically, by failing to obtain an expert witness who would testify about the Petitioner's mental disease or defect

related to fetal alcohol spectrum disorder. The Petitioner testified that he faced a life sentence if convicted of first degree murder, which he understood involved serving fifty-one years. He said that about five days before he entered his guilty plea, he and counsel discussed the evidence against him for the first time and that he received copies of the witnesses' statements, which had been provided to counsel earlier than required. *See* Tenn. R. Crim. P. 26.2; *see also Jencks v. United States*, 357 U.S. 657 (1957). The Petitioner said counsel had represented him for about three and one-half years at this point. The Petitioner said that he first learned of a twenty-five-year offer from the State in November, the same month he entered the guilty plea. He said the final plea agreement involved a thirty-year sentence but did not know why the sentence length changed from the original twenty-five-year offer. He did not ask counsel about the change.

The Petitioner testified that before the discussion of the plea offer, he had understood that they were going to trial with a "psychological defense," although he was unable to explain what the defense would entail. He said defense counsel probably explained the elements the State would have to prove to establish first degree murder, although he could not recall if counsel did. He did not recall, either, if counsel discussed the requirement that the State prove premeditation. Relative to the requirement that the State show intent to commit the offense, he said he and counsel discussed fetal alcohol syndrome. He said he first heard of the syndrome from counsel around 2010. He said "Dr. Brown," a specialist,

was supposed to write a report regarding fetal alcohol syndrome and the Petitioner's ability to form the intent for first degree murder. The Petitioner and counsel discussed the possibility of Dr. Brown's testifying for the defense, and the Petitioner met with Dr. Brown in approximately 2010. He said he talked with Dr. Brown and took a test. He did not recall agreeing for her to review his prior medical records. He said he understood that meeting with Dr. Brown was relevant to the defense but did not know why it was important. He said he also met with Dr. Adler, answered questions about his background, and underwent a physical examination.

The Petitioner testified that after he met with Dr. Brown and Dr. Adler, he and defense counsel discussed that one or both of the doctors would probably testify at the trial about the Petitioner's ability to form the intent necessary for first degree murder, which the Petitioner understood would be an important aspect of the trial.

The Petitioner testified that when defense counsel told him about the twenty-five-year offer, counsel advised him not to accept it because counsel was awaiting a report from Dr. Brown. The Petitioner said he learned from counsel that Dr. Brown had not provided the report because she had not been paid. He said he first learned that the defense experts might not testify at the trial when counsel asked the trial court to reset the trial date. He said he and counsel did not discuss why the plan changed regarding presenting the expert witnesses.

-4-

The Petitioner testified that he and defense counsel had further discussions about the twenty-five-year offer and that when counsel asked if he wanted to accept, he told counsel, "Sound [sic] like the best thing goin'." He said the offer seemed to be the best option because he did not have an expert report from Dr. Brown. He said he never asked counsel if counsel would be able to obtain Dr. Brown's report. He acknowledged he received a report from Dr. Adler. He said he had understood that Dr. Brown was an expert on fetal alcohol syndrome and that her report would be a significant aspect of his defense. He said counsel was unsuccessful in obtaining a continuance after Dr. Brown did not make her report available.

The Petitioner thought the unavailability of the report affected the State's plea offer, which was increased to include a thirty-year sentence. He said defense counsel told him that if he did not accept the thirty-year offer, he could go to trial and face a life sentence. He said counsel did not explain that the State had the burden of proof at a trial. He said they did not discuss whether the Petitioner would be able to testify in his defense. The Petitioner said he felt he had no choice other than to accept the offer. He said that ultimately, he was convinced to take the offer because counsel told him he would receive a life sentence if he went to trial. He said he did not ask if a viable defense existed. He said that he understood the difference between Range I and Range II and that he knew he was accepting an above-

range, Range II sentence.  He said counsel did not explain why an above-range sentence was necessary.

The Petitioner testified that he realized after he reached the penitentiary that his guilty plea had been a mistake.  He said that after looking at his "time sheet," he realized he would serve 100% of his thirty-year sentence but that defense counsel had advised him he would only serve about eighteen years.  He said he also realized his guilty plea had been a mistake after he wrote to Dr. Brown and received a response stating that counsel had not responded to Dr. Brown's emails.  He said that he wrote to counsel and requested a copy of the plea hearing transcript but that counsel never responded.

The Petitioner testified that if defense counsel had told him he would have Dr. Brown's report and expert testimony at his trial, he would have rejected the plea offer and gone to trial, although he faced a life sentence if convicted.  He understood that if the post-conviction court granted relief, he would face a first degree murder trial and the possibility of a life sentence.  He understood that even if he had a defense to present regarding his ability to form the intent to commit first degree murder, he might be convicted at a trial.

On cross-examination, the Petitioner testified that he and defense counsel never reviewed the witness statements together.  He acknowledged, though, he knew that

eyewitnesses to the shooting were willing to testify that he shot the victim and walked calmly out of the school cafeteria. He acknowledged his awareness of witnesses who would testify he bragged about committing the shooting. He was aware an eyewitness would testify the victim said, "Do it, do it," before the Petitioner shot the victim. He was aware the victim's and his DNA were on the gun used in the shooting.

The Petitioner testified that he did not understand why Dr. Brown was not paid and that he thought he could not use the fetal alcohol syndrome defense because she had not been paid. He said he was aware that if Dr. Brown's report had been available, the State could have called other experts to challenge Dr. Brown's opinions. He acknowledged he had been examined by other experts before Dr. Brown became involved. He knew Dr. Tennison provided a report to the juvenile court before the Petitioner's case was transferred to criminal court. He recalled speaking with Dr. Tennison but did not know the contents of Dr. Tennison's report. He recalled, however, that he told Dr. Tennison about his previous involvement in juvenile detention and juvenile court. He acknowledged that he probably told Dr. Tennison about his alcohol and drug use and that he probably said he did not feel like he needed alcohol and drug treatment. He acknowledged that he probably told Dr. Tennison he had experienced problems at school since kindergarten, that he was tired of school work, and that he was not enrolled in special education classes. He agreed he probably told Dr. Tennison he had never received mental health treatment. He agreed that school testing in

2006 showed he did not have an intellectual disability. He was unaware Dr. Tennison had information from law enforcement about the Petitioner's prior criminal activity, his prior interactions with the victim, and his alleged statement to another individual in juvenile detention that was supportive of his intent to kill the victim. He did not recall making several statements to Dr. Tennison about angry and homicidal thoughts, although he acknowledged he probably made a statement about hurting himself.

When asked if he recalled an examination in December 2008 by Dr. Jones, the Petitioner said he recalled talking to a woman. He was unaware of the contents of her report. He did not recall discussing several matters with her, including his taking a gun to school several times before the shooting and his taking a gun to school on the day of the offense because he was "mad at the world." He did not recall telling Dr. Jones the victim kept telling him to shoot the victim. He said Dr. Jones accused him of lying and "stormed out" of the room a few minutes into their meeting.

The Petitioner agreed that Dr. Tennison and Dr. Jones found him competent for trial. He said defense counsel never talked to him about a statement in the report prepared by Dr. Tennison and Dr. Jones that he did not show "impairment in his ability to create and sustain a self-serving motivation in a legal sense."

The Petitioner recalled Dr. James Murray's evaluating him in June 2010. He was unaware that Dr. Murray did not find any evidence of mental disease or defect or that Dr. Murray found the Petitioner's mental status improved following Dr. Tennison's and Dr. Jones's evaluations.

The Petitioner acknowledged that the information the experts had about his background might be admitted at a trial.

The Petitioner recalled his confusion at the plea hearing about the percentage of his sentence he would be required to serve. He acknowledged his telling the judge he understood the percentage of the sentence he would be required to serve. He agreed the judge was respectful and explained his rights to him. He also agreed that he told the judge he was pleading guilty of his own free will and that defense counsel had explained everything to him.

The Petitioner testified that he prepared his post-conviction petition with the help of another inmate whose given name he did not know. He denied, though, that his allegations were based upon what other inmates told him to allege.

Defense counsel testified that although he was not appointed initially to represent the Petitioner, he was appointed after the public defender's office discovered a conflict of interest. Counsel said Dr. Murray was local and was extensively involved in the case. He agreed that a "fairly comprehensive evaluation" of the Petitioner existed before the juvenile transfer hearing.

Defense counsel testified that he was aware the Petitioner made incriminating statements while confined in juvenile detention. He agreed the testimonial evidence against the Petitioner was significant and characterized it as overwhelming toward the end of counsel's representation. He agreed that the Petitioner faced a trial without a defense expert regarding mental disease or defect.

Defense counsel testified that the possibility of fetal alcohol syndrome emerged fairly early. He thought it emerged through Dr. Murray's evaluation. He acknowledged that Dr. Murray's report contained information regarding the Petitioner's statements about violence that could have been prejudicial at a trial. Counsel said Dr. Tennison was unable to exclude a diagnosis of fetal alcohol syndrome. He said fetal alcohol syndrome was difficult to understand until someone explained it, its causes, and its effects. He said that he, Dr. Murray, and Dr. Adler collected boxes of Department of Human Services records from Florida and Tennessee relative to the Petitioner. He said the records did not include any

medical records from a neonatal intensive care unit at the hospital at which the Petitioner was born. He said that the Petitioner's mother "kind of disappeared" after the juvenile transfer hearing and that the defense was hampered because counsel was unable to locate her to explore fetal alcohol syndrome as a possible defense.

Defense counsel testified that Dr. Adler was part of a team of medical experts who testifide nationally about fetal alcohol syndrome. He said Dr. Adler and his team were in the Seattle area but were in different offices. He said they were the only people of whom he was aware who did work of this nature. He described Dr. Adler as the "big picture person" and would have been the main defense expert. He said that Dr. Adler evaluated the Petitioner for several hours and that Dr. Brown conducted a forensic evaluation of the Petitioner.

Regarding the issue with payment for expert services, defense counsel testified that Dr. Adler had worked in Tennessee previously and knew what to expect from the Administrative Office of the Courts (AOC) but that Dr. Brown had not worked in Tennessee and did not know what to expect. He said that Dr. Brown's initial "packet" proposed greater expense than the AOC would approve and that he told her and Dr. Adler, "They're not going to pay that; you're going to have to tear it down." He said Dr. Adler understood but Dr. Brown did not. He said Dr. Brown was paid for some of her work but did not provide a report. He said he eventually learned she was not going to provide her report until she was

paid. He said she was under the impression "they would just give her money." Counsel said this occurred at a time the AOC was trying to cut its budget. He said that he requested the trial court's assistance and that "things started moving a little faster," although they did not move quickly enough for Dr. Brown. He said a backlog in claims processing occurred. He said that at this point, he had Dr. Adler's report but that it was insufficient without Dr. Brown's report to support a defense based upon fetal alcohol syndrome.

Defense counsel testified that when he realized Dr. Brown would not provide a report, he talked to the Petitioner and the prosecutor about the issue. He did not recall when the plea offer was made but said that before it was made, the prosecutor had provided him with the witnesses' statements, which he was not entitled to receive until after the witnesses testified at a trial. Counsel said he took the statements to the Petitioner. He said that the statements contained more information than he had obtained previously from the police reports and that he was surprised by some of the contents of the statements.

Regarding Dr. Brown's failure to provide a report, defense counsel testified that he spoke with Dr. Adler repeatedly and Dr. Brown sporadically. He said he later learned that Dr. Adler was a figurehead and that Dr. Brown and Dr. Adler did not speak regularly. He said that he explained to Dr. Adler that Dr. Brown would be paid but that it might take two

or three months. He expected Dr. Brown would receive the information and said she did eventually, although she wanted to be paid in advance and had stopped working on the case.

Regarding Dr. Adler's report, defense counsel testified that Dr. Adler did not have the Petitioner's birth records or a CT scan of the Petitioner's brain. Counsel agreed that the Petitioner told Dr. Adler about the Petitioner's drug and alcohol use and reported no psychiatric history. Counsel agreed Dr. Adler's report contained information about the Petitioner's thoughts of harming others that might concern some jurors.

Defense counsel testified that he spent "an incredible amount of time" with the Petitioner when the Petitioner's case was pending in juvenile court. He said that after the case was transferred to criminal court, he spent time with the Petitioner whenever the Petitioner had a problem, even though counsel was involved in a lengthy death penalty trial. Relative to the Petitioner's mental status, counsel said he recognized quickly that "something wasn't really there; something wasn't working." He said he contacted Dr. Murray and initiated the evaluation process. Counsel said the Petitioner's affect was flat and it was difficult to know if the Petitioner comprehended things. He agreed that according to the Petitioner's school records predating the offense, the Petitioner was of borderline intellectual functioning but was not intellectually disabled.

Regarding the guilty plea, defense counsel testified that he was confident the Petitioner understood what was happening. He thought the Petitioner's plea was voluntary. He thought the Petitioner was given all the necessary information to make an informed decision. He said he and the Petitioner went over all of the reports.

On cross-examination, defense counsel testified that in criminal court, the defense centered on attacking the element of premeditation through proof of fetal alcohol syndrome as a mental disease or defect that rendered the Petitioner unable to form the intent for the offense. Counsel agreed that expert witness testimony was necessary for this defense. When asked if a credible defense existed that the Petitioner did not commit the killing, he noted that the killing was committed in a room full of eyewitnesses.

Defense counsel testified that Dr. Adler originally wanted to bring his four- or five-member team to Tennessee but that the AOC denied funding. Counsel said Dr. Adler decided that Dr. Adler and Dr. Brown would travel to Tennessee, that another expert would work from Seattle, and that Dr. Murray, who was local, would function as a member of the team. He said the members of Dr. Adler's team were the leading authorities on fetal alcohol syndrome. He said they were the only group nationally that provided the service they offered. He agreed the AOC preferred use of in-state witnesses when possible.

Defense counsel agreed that Dr. Brown was dissatisfied from the beginning with the rate of compensation the AOC would pay, although she did not say she would not work at the rate. He agreed Dr. Brown was also dissatisfied with the number of hours for which the AOC approved funding because she thought more hours would be required, although she agreed to do the work. He said Dr. Brown was aware of these matters when she flew to Tennessee to administer tests to the Petitioner. He said he never received the test results or any documentation regarding her meeting with the Petitioner or her conclusions. He said Dr. Brown's report was critical to the defense because she was supposed to provide the information regarding intent. He said he learned from Dr. Adler that Dr. Brown would likely state that in her opinion, the Petitioner was unable to form the intent for first degree murder. Based upon this information from Dr. Adler, he anticipated Dr. Brown's report would have been helpful to the defense. He anticipated that had the case proceeded to a trial, Dr. Brown would have been called as a defense witness.

Defense counsel testified that he spoke with Dr. Adler frequently but did not communicate with Dr. Brown as often. He said his communication with Dr. Brown was often by email. He said he had "very little" communication with Dr. Brown during the time she was disappointed about the compensation. He felt sure he spoke with Dr. Adler and explained the payment issue. He agreed that the AOC ran out of money at the end of each fiscal year and that in the Summer of 2011 when these events occurred, the AOC had a

financial crisis that resulted in experts and attorneys not being paid. He was unsure if Dr. Brown was aware of what was occurring with the AOC at the time.

Defense counsel testified that he learned a short time before the plea agreement was reached that Dr. Brown would not provide her report without payment. He said he learned Dr. Brown would not provide the report shortly before he received the witnesses' statements and before the hearing on the motion for a continuance.

Defense counsel testified that he explained the defense theory to the Petitioner, including the use of expert witnesses regarding fetal alcohol syndrome. He did not recall if any of their discussions took place before he became aware that no report from Dr. Brown would be available.

Defense counsel testified that he received a plea offer for second degree murder and that he thought the offer involved a twenty-five-year sentence. He said he would have advised the Petitioner of the offer. When asked if the Petitioner had any interest in a plea agreement before they learned Dr. Brown would not provide a report, he said he thought the Petitioner was "on board" with going to trial with the fetal alcohol syndrome defense. He thought the thirty-year offer was received after they learned Dr. Brown's report would not be forthcoming. He said the lack of her report was "devastating" to the defense. He was sure

he discussed the situation with the Petitioner. Relative to the conversation, he said they talked through the effect on the defense, but the Petitioner's affect was flat and "there wasn't much as far as emotion." He felt sure the absence of a report was important to the Petitioner, although he could not tell by talking to the Petitioner.

Defense counsel testified that he and the Petitioner discussed the Petitioner's desire early in the case to pursue a self-defense strategy, which counsel advised against. Counsel did not recall the Petitioner's ever requesting a plea offer.

Defense counsel testified that when the continuance was denied, the Petitioner was in the position of going to trial without a defense. Counsel said he was unaware of any other avenue for pursuing a defense expert on fetal alcohol syndrome. He said that after the continuance was denied and after he and the Petitioner reviewed the statements of ten to fifteen witnesses that counsel had been provided, they started considering the thirty-year plea offer. He said the statements "put intent . . . into play." He said the Petitioner agreed to accept the offer.

After receiving the proof, the post-conviction court found that the Petitioner failed to prove that defense counsel's performance was deficient. It likewise found that the Petitioner understood the plea agreement and entered his guilty plea freely, voluntarily, and knowingly.

Because the Petitioner failed to establish both prongs of an ineffective assistance of counsel claim, the court denied relief.

On appeal, the Petitioner contends that he received the ineffective assistance of counsel because his defense counsel failed to obtain the reports and evidence from Dr. Brown relative to fetal alcohol syndrome and that as a result, his guilty plea was not voluntarily entered. The State counters that the Petitioner failed to prove that counsel performed deficiently and that the alleged deficiency affected the voluntariness of the plea. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound,

but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The evidence shows that defense counsel located Dr. Adler and his team, whom counsel identified as the only group of fetal alcohol syndrome experts in the country. Counsel arranged for their services within the AOC's limits for indigent defense funding. Dr. Brown was unhappy with the compensation arrangement, but she nevertheless agreed to work on the case. After undertaking the work, Dr. Brown became dissatisfied with the speed with which she was compensated by the AOC. She refused to provide a report until she received payment. Counsel explained the issue to Dr. Adler, whom counsel thought at the time regularly contacted Dr. Brown, and urged patience. Dr. Adler was familiar with Tennessee's compensation system, although Dr. Brown was not. Counsel sought the trial court's assistance in obtaining payment for Dr. Brown, although the efforts were of limited success because a backlog of claims existed. Counsel sought a continuance, which would

have allowed more time to resolve the payment issue and receive the report, but his request was denied. He assessed the fetal alcohol syndrome defense theory in the absence of Dr. Brown's completion of the work and in light of the witnesses' statements he received from the State, and he determined that the better course was to explore a plea agreement, rather than going to trial with the prospect of a life sentence.

The Petitioner testified at the hearing that he wrote to Dr. Brown and received a response in which she blamed defense counsel for failing to communicate with her. Counsel acknowledged that Dr. Adler, not Dr. Brown, had been his primary point of contact and that at the time, he thought Dr. Adler and Dr. Brown communicated more with each other than he later realized was the case. He said, though, that he communicated to Dr. Adler that Dr. Brown would be paid and that the information eventually reached Dr. Brown. Nevertheless, Dr. Brown never provided a report, which left the defense in an untenable position. Counsel testified at the post-conviction hearing that although he had Dr. Adler's report, he needed Dr. Brown's report to support a credible defense based upon fetal alcohol syndrome.

Upon review, we conclude that the evidence does not preponderate against the post-conviction court's determination that the Petitioner failed to prove defense counsel's performance was deficient. The evidence shows that Dr. Brown was dissatisfied from the beginning with the AOC's rate of compensation and the number of hours approved, although

she initially agreed to work on the case. She decided, at some point, not to complete the work unless she was paid before providing her final work product. Counsel attempted to resolve the issue with her through Dr. Adler, sought the trial court's intercession with the AOC, and sought a continuance. Given the circumstances, counsel's performance was not deficient.

We likewise conclude that the post-conviction court did not err in determining the Petitioner failed to establish clear and convincing evidence of prejudice from defense counsel's alleged deficiencies. The Petitioner testified that he would have rejected the plea offer if counsel had told him Dr. Brown's testimony and report would be available at the trial. Dr. Brown's unwillingness to provide a report and to participate as a defense expert, notwithstanding counsel's attempts to have her outstanding bills paid, was beyond counsel's control. We likewise note that the Petitioner failed to offer any proof at the post-conviction hearing that Dr. Brown would have provided a report to support a fetal alcohol syndrome defense. The Petitioner has not shown that the situation he now claims he desired – a trial at which he presented a fetal alcohol syndrome defense – would have occurred absent Dr. Brown's compensation issues.

We view our determination that the post-conviction court did not err in rejecting the Petitioner's ineffective assistance of counsel claim as dispositive of the case. Because the

Petitioner contends that his guilty plea was not voluntary as a result of the alleged ineffectiveness, however, we will address the post-conviction court's findings relative to the voluntariness of the plea.

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The guilty plea hearing transcript reflects that the Petitioner understood his rights and that he knowingly, voluntarily, and understandingly waived them and pleaded guilty to second degree murder with a thirty-year, Range II sentence to be served at 100%. He acknowledged his satisfaction with defense counsel at the time of the plea.

Defense counsel testified that he spent an extensive amount of time with the Petitioner throughout his representation, which lasted over three years. Counsel considered the Petitioner's initial suggestion of a self-defense theory and determined that it was not the better course based upon the presence of numerous eyewitnesses. Instead, counsel pursued a fetal alcohol syndrome defense. Based upon a conversation with Dr. Adler, counsel thought Dr. Brown's report would be favorable but ultimately, counsel could not know what Dr. Brown would say without the report. When it became apparent that Dr. Brown's report would not be provided and that no continuance of the trial would be granted, counsel reassessed the viability of the fetal alcohol syndrome defense in the absence of evidence from Dr. Brown and in light of the witnesses' statements that the State had recently provided him. Counsel explained the circumstances to the Petitioner, and although the Petitioner was unemotional, counsel thought the Petitioner understood.

The Petitioner faced a life sentence if convicted of first degree murder, and he was in an unfavorable position to stand trial for the offense in the absence of a defense expert who

could challenge the State's proof of his intent to commit the charged offense. Defense counsel was able to obtain a plea offer for a second degree murder conviction with a thirty-year sentence. Counsel advised the Petitioner of both the terms of the plea offer and the realities of going to trial without Dr. Brown's participation. The Petitioner considered his options and chose to accept the offer.

The post-conviction court found that the Petitioner "understood the significant consequences of the plea and accepted what he could get." The evidence does not preponderate against the court's determination that the Petitioner failed to show he was prejudiced by defense counsel's alleged ineffective assistance.

The post-conviction court did not err in denying relief. The judgment is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE